The 믿full problem I am dealing with is issues related to security   Counsel for the opponents, how will you allocate your time? I think we were hoping to split it. Very fine, you can throw the entire 15 minutes, any way you like is fine. Thank you. Counsel, you may proceed. Thank you, Your Honor. At this court, my name is Brooks Holland and I represent Armando Garcia Villalba. Your Honor, Armando Garcia Villalba was convicted after a jury trial of participating in a large-scale drug conspiracy here in Washington State and elsewhere. The district court sentenced him to 10 years in prison, the statutory mandatory minimum. On appeal, my client raises two issues for this court's review. Mr. Garcia Villalba challenges the denial of his motion to suppress telephone communications that have been intercepted pursuant to a Title III wiretap order. My client also challenges the denial of his motion to suppress physical evidence that was seized pursuant to a search warrant at 17900 Dunbar. I couldn't get exactly what was supposed to be the matter with the wiretap warrant. I read the brief and I understand the general principles. One of the cases that says, I guess the main case we have that says there wasn't a good enough basis for it, is really different. It looks like, well, I can't see what's the matter with the warrant. Tell me in plain English without the principles and then you can relate it to the principles in the cases. Tell me in plain English what the warrant doesn't say that it needs to say to justify the wiretap. Well, I think the best way I could do that, Your Honor, is to put the wiretap application for the one we're challenging, which was the fourth wiretap in this investigation, up against the application for the first wiretap order that was issued that targeted the Delgadillo Uribe organization. The fourth wiretap we're challenging targeted the Garcia organization. If you look at the first wiretap, you can see allegations in support of necessity for that. This is not really what I want. What I want is looking at the affidavit that you say is inadequate, show me what it doesn't say that it should have said. Sure, Your Honor. In terms of the full and complete statement of necessity. Right. Just because they do a fuller one in another warrant doesn't really do the job for me. I want to know what's the matter with this one. What's lacking? What's lacking is the application for the fourth wiretap offers virtually no investigative methods that were pursued before the wiretap order was sought in that part of the investigation. It's important that by the time we reached the fourth wiretap order, law enforcement had shifted its focus to target the Garcia organization. The first three wiretap orders focused on the Delgadillo organization. Here we're looking at the Garcia organization. The point of other investigative methods, it's not just mechanical or working down a checklist. It's to show you couldn't have gotten this information some other way. Correct. What they want is the content of the conversations. How else were they going to get it? Well, here the necessity requirement requires the government either first to show, here's what we tried to get to this information, and it didn't get us there. And there's virtually nothing. How else was they going to get it? Confidential informants, undercover operations, physical surveillance, video surveillance. Aerial surveillance. Physical surveillance and aerial surveillance. We mentioned that in Gonzales because they could see whether any coyotes were coming and going just by putting up a camera, but here you can't do that. And they said that because of where this target lives, they couldn't hang around outside without being seen, and he did some evasive and protective maneuvers, as I recall. Don't understand that part. On the informants, I thought they did have something about that. The informants were used during the first wiretap investigation. They used confidential informants to get into the Delta VO organization, and those informants were able to place Agent Hackett in an undercover capacity into the Delta VO organization. That application demonstrated the limits that that traditional investigative set of techniques would reveal about the scope, size, and participants in that organization. In the fourth wiretap application, there were no confidential informants used, and all was explained is none were developed. My one from the Delta VO organization, as far as I know, didn't know anything about Garcia or his organization, and no other opportunities for CI work were presented to me. I couldn't do undercover work because I was afraid that it somehow would reveal other aspects of the investigation or wiretaps. The physical surveillance, all that was offered were explanations as to why physical surveillance failed or stopped producing results or created problems in the Delta VO investigation. The fourth wiretap... That's not quite so. They did say why it was difficult to do physical surveillance of this particular house. Of the residents, correct. I'm sorry, Erin. I was thinking more about vehicle or other individualized surveillance. The counter surveillance techniques that were offered in the fourth wiretap application all involved Delta VO, and there was evidence in that wiretap application that Delta VO had made law enforcement suspect that he was being surveilled instead of... Do you know if they even know what these people look like? I'm sorry, Erin. Do you know if they even know what these people look like? From the wiretap applications, it appears they knew who Cecilio was, who was the suspected head of the organization. They certainly knew where he lived because the application said that we could not surveil his residence, although all was explained about the inability to surveil his residence was that it was in a rural area and there weren't a lot of bushes or other cover nearby. As I explained in the brief, that seems to paint a rather simplistic, at least in my experience, understanding of law enforcement surveillance capabilities, and that's why I suggested looking at it in comparison to the first wiretap application where they talked about... I'm not sure that Delta VO... I mean, they had specific evidence that Delta VO was not being amenable to surveillance, that he was avoiding them and so on. And here they haven't... There's no evidence that they tried, is what you're saying. Correct. I think the application for the first wiretap, the first three, really, but particularly the first wiretap for the Delgadillo organization, looks a lot like the wiretap application recently upheld by this Court in the Rivera case. Whereas if you look at the fourth wiretap, you see nothing really other than some gestures towards some surveillance, really derivative of the surveillance of Delgadillo, a different organization and different set of individuals. What were the gestures? The gestures were that they had tried to surveil Garcia, Cecilio Garcia Villalba, by following around Delgadillo, who already had started to employ counter-surveillance methods because he had suspected that he was being detected. What about the... They'd arrested a bunch of people by this time. Correct. Right? And they don't really say... This is actually the one piece that bothered me, is that with regard to those people, including Delgadillo, they don't say that they refuse to cooperate. They say that he was not questioned and is not cooperating. And they say about why he's in custody. They don't say anything about whether they tried to question him. And with regard to Johnson, they say he's in custody. They don't really say why they couldn't... They say Alexander Acosta was not questioned after being arrested. So although they say these people weren't cooperating, they also say for the most part they didn't ask him anything. Correct. And that's another one of the problems that we highlighted with the application for the fourth wiretap. There's really no explanation as to why working with potential cooperators wouldn't yield results without the intrusion of a wiretap order. But they had these people in custody. All that was offered... Something about these were low-level people. Some of them were, but Delgadillo wasn't. No, these were the targets of the investigation, the first three wiretap orders, largely. Ronald White, Delgadillo, the other individuals you mentioned. And all was explained was that if we questioned these individuals for information about Cecilio's organization, it could risk compromising our investigation. And I think if you start to look at the explanations for why so little was done prior to seeking the fourth wiretap as reasonably demonstrating necessity for that degree of intrusion, I don't think trial counsel engaged in hyperbole in saying we reached the point where it would be very unlikely to envision a case in the circumstance where a wiretap wouldn't always be necessary as a point of getting to the conspiracy. That does seem like hyperbole to me. I mean, if you bust some low-level members, which is what they say they did, and they decide and they don't say make me a deal, I'll roll over, then you're not getting anything. But the affidavit should explain that those efforts were made, and there's absolutely no statement in the affidavit supporting the fourth wiretap that any of these efforts were made. All that was explained is these people we determined should not be questioned largely because if we question them, we could risk compromising the investigation. I don't see what's the matter with that either. I mean, you go into a deposition in a civil case, your questions reveal to opposing counsel just what your theory is, what you already know, what records you're familiar with. You can't ask questions without disclosing a lot. I think that the lack of questioning of any available sources of information who are already in custody or under indictment has to be put in the context of everything else that was not done in terms of traditional investigative techniques prior to seeking a full warrant. You can't question people who are in custody unless they choose to be questioned. Correct, and at that point they're going to be represented by counsel and the government can work through counsel through the typical and usual mechanisms for getting information that might be available. Well, where is it to say that they didn't question the people in custody because it would reveal their investigation? Judge, I believe it was part of the application in support of the fourth wiretap, which I believe would come in pages 55 to 60 in the original excerpt of record. Counsel, you're down to less than five minutes for your side, so I'm thinking of your co-counseling. I appreciate that, Your Honor. I don't want to not respond to the Court's questions, but with the Court's permission I do want to make sure I yield time to co-counsel for his argument. Thank you very much. Very well. Thank you. Good morning. May it please the Court. My name is William Eichelman. I represent Jesus Antonio Garcia Villalba, and I'd better move quickly because a lot of my time has been used up. The issues that I've raised in this appeal essentially go to the question of the admission at trial of statements that were taken from my client after he was arrested. And I focused on three things. One is whether or not the tactics that were used to obtain the statements, in combination with the amount of time before Jesus was brought before a magistrate, together with the arresting agent's admonitions not to tell anybody about his cooperation, resulted in the improper admission of his statements. Well, he was Mirandized, but your argument is that this synopsis was inappropriate? Is that your point? That's part of the argument. Yes, he was initially Mirandized, but before he was Mirandized, essentially what happened is the, if you go back and look at the testimony from the suppression hearing, the agent admitted on cross-examination that it had been part of their plan to have the Washington State Patrol stop Jesus so that they could isolate him. And that's essentially what happened. He was taken, placed in a patrol car, government car. The DEA agent then basically said, just listen to me. What I'm going to tell you is that we've got a ton of evidence against you. We've been investigating you and your family. But he didn't say, I mean, if he had said something at that point, Jesus, maybe you'd have some argument, but he didn't say anything at that point. So what's the problem? Well, he did, because following that. Only after the Miranda warning. So there was no cat out of the bag problem or anything else. He just didn't say anything. So what's the issue? Well, he did get a Miranda warning, and then there's a two-hour drive to Everett. Yeah. And when he gets to Everett, the agent tells him that he shouldn't tell anybody else about their conversation. Well, in context, what he said is it didn't seem to me any fair reading to include a lawyer. I mean, that's the argument, right, that he was telling him not to have a lawyer. Well, why wouldn't he assume that when he said don't tell anybody, that's what he meant? Well, he didn't exactly say that, don't tell anybody. He said something more measured than that. Well. I think, Mike, it's worth more to us if you don't tell these other people, and the people they've been talking about all along were his cohorts. His testimony is, and I quote. Give us the page number. It's in the excerpts of record, volume one, page 19. The number in the upper right-hand corner of the transcript is 50. And then on line 23, he says, I said that his information, his cooperation would be most valuable to us if others didn't know he was cooperating. Okay. And then on the next page, on line 11, he says, I told him if anybody found out, if others found out that he was cooperating, that his information would be less beneficial to us. Why in that context would that mean you can't tell your lawyer? I would think it would mean you can't tell the other people in this conspiracy because we don't want them to know you're snitching them out. Well, that's one interpretation. Kind of a mutual interest in that. That's certainly part of what he was saying, I think. But if you put yourself in the position of a 20-year-old who's just been arrested, who's been interrogated for two hours on a drive to jail, and then he's told that it's in his best interest not to tell anybody, why wouldn't he simply take that literally? I mean, it's one thing to say, well, this is what he meant to say. Frankly, that he would. Also, we can tell his lawyer and it's a secret. His lawyer is not going to tell anyone he told him. Well, he said don't tell anybody. I'm having trouble with both halves of this. On the Elstad and Siebert argument, it's basically a police technique where you interrogate without Miranda, the person lets the cat out of the bag, and then you do the two-step procedure, ask him the same questions and see if he'll give you the same answers. And here that doesn't apply because he didn't let anything out of the bag before his Miranda warning. And then on this, I have to take a strange interpretation to think that he means don't tell your lawyer. Well, he just says don't tell anybody. And I think anybody means anybody. Thank you, counsel. Your time has expired. We will hear from the government. Good morning, Your Honors. May it please the Court. My name is Michael Morgan and I'm representing the government on this appeal. I'll begin with, unless the Court prefers it otherwise, I'll begin with Jesus. As we pointed out in our brief, there's a threshold question of whether any of Jesus's claims are even reviewable by this Court. The suppression claims that are being raised on this appeal were not the suppression claims that were raised at the suppression hearing, neither of them. So under Rule 12e, there has been a waiver. What was raised at the suppression hearing? There were two claims raised at the suppression hearing. One was that there was never a challenge to the validity of the Miranda waiver itself. It was the ensuing statements were involuntary because they were induced by promiscuity. You say it's voluntariness. Isn't that really enough? There's definitely no. I mean, there's voluntariness in the traditional, my will has been overborne, voluntariness. And then there's the prophylactic voluntariness that follows an invalid Miranda waiver. And at the suppression hearing, the only issue was pure voluntariness. And even if it was a voluntariness issue, it was a different one. It was, I was promised leniency, not that you somehow rendered my statements involuntary because you gave me a synopsis of the evidence. So it's just even under if you assume it was a voluntariness question, it was a different voluntariness question. And the other issue at the suppression hearing was whether or not the second-day statements were inadmissible because Miranda was not readministered and that claim has been abandoned. So we're talking about two totally different suppression claims now on appeal. And under this Court's precedence, those claims, having been waived, are not even reviewable for plain error. But leaving aside the procedural issue, on the merits, it seems clear that an agent's providing the suspect with truthful information, there's no allegation that the agent in any way misled the defendant about the information that was provided to him vis-à-vis the synopsis of the case. And ensuring that the defendant did not give any statements until he was Mirandized, that, I would suggest that technique is perfectly proper in that it allows the defendant to make a knowing decision as to whether or not it's in his interest to cooperate. If they've got this kind of evidence against me, it may be in my best interest to waive my Miranda and speak, versus if he didn't provide a synopsis of what they had against him, the defendant is essentially trying to make the Miranda waiver in the dark. With respect to the argument that somehow or other the agent dissuaded Jesus from speaking with his counsel, in context, there's little doubt that by saying your cooperation would be more valuable if others don't know you're cooperating, the others refers to his co-conspirators. In fact, the other thing that I think you need to answer counsel's argument, why couldn't that also include your lawyer? As a matter of grammatical construction, it could have, but would it reasonably have been interpreted that way given the context of the conversation? And wasn't Jesus asking whether you're going to tell anybody else, meaning his co-conspirators? So it wasn't that way? Yes, he in fact was, and was in fact expressing concern that people might find out. And obviously one way to allay that concern is not to tell them, which is what the agent was relaying to him. Anyway, you're going to turn to the … I will turn to the wiretap affidavit. Let me repeat that my major concern about the wiretap, I mean it does get to the question ultimately of whether this becomes so generic that it could be done in any drug conspiracy, and I don't think that's where we are with old case law. And in particular, I'm concerned about all of these people who were arrested and who the information about them doesn't say we asked, we interviewed them, but they wouldn't speak. Respectfully your … I'm sorry. I'm sorry. I mean, I was prepared to address that point. Looking at the affidavit I think is the easiest way to do it. I am looking. I'm looking at page 50. Yes. Beginning on page 50, if we begin with White, which is paragraph 29. I didn't identify Delgadillo. Right. So he was questioned, and he provided the name of his source, who was Delgadillo. Okay. And we don't know whether they asked him about any of these people. We don't know that they did, but we don't know that they didn't, but we know that the information he provided them. That might be relevant. Okay. It might be relevant, although there's no evidence in any other affidavit suggesting that White, White was the target of the first wiretap, which was targeting Delgadillo. There was no indication that White had any contact whatever with Garcia Villalba. He gets to Delgadillo on the next page and says he was not questioned. And is not cooperating. And is not cooperating. Yes, but he wasn't questioned. Well, could the affidavit have spelled out more clearly that the not cooperating is why he was not questioned? Sure. But I think right in context he is I mean, ordinarily in order to get someone to cooperate, you have to question them. Well, would you like to cooperate at least? Or, you know, what happened here and who your sources are or something. And he says he was not questioned. I would read that, I would personally read that sentence and say he is not questioned, he is not cooperating. It is inconceivable to me that when he was arrested, and by the way, it's worth remembering he was arrested on an unrelated matter. He was arrested on some California warrants. But he was the target and he was their link to Oh, yes. And ultimately he ultimately did cooperate, as we know, later. But this language suggests that he was approached and wasn't willing to cooperate at that time, so he's not questioned. So what is this? I agree that it's at the second end of the conjunction. But the question is reading the sentence in context. I'm reading it. It says he was not questioned. But you don't think And he's not cooperating because he wasn't questioned. I guess my question, I read cooperating as modifying the questioning. Could it be read differently? Obviously, at least one person is reading it differently than that. But nevertheless, it's not as if, I mean, the affidavit does list that he was arrested and at least approached, it would seem to me. But leaving aside Delgadillo-Uribe, we have the other individuals. We have Johnson and Burrell. Okay. They did cooperate. They cooperated. They gave the information, again, related to Delgadillo-Uribe. Acosta did not cooperate. She didn't cooperate. Alexander Acosta was not questioned.  And again, Acosta, these are all targets of one and two. They're people who are dealing with Delgadillo-Uribe. And remember, Garcia Villalba is Delgadillo-Uribe's supplier. So it's very unlikely that people who are down the chain are going to have knowledge. Delgadillo knows who's supplying him. I agree. And respectfully, I don't read that sentence to say that the agents had no interest in questioning Delgadillo-Uribe. I read that to say that he chose not to cooperate following his arrest. And the issuing judge, I would suggest, also read it that way. Did he say anything about that comment? Well, no, because we just have this they just signed the warrants. But I don't seem to recall at any point at the suppression hearing anyone sort of suggesting that Delgadillo-Uribe was not pursued as a suspect. And I think this is actually a key – Pursued as a suspect, but he wasn't questioned. That's what it says. I think a key issue here, respectfully, is that there was no evidentiary hearing on this topic. The court stood ready to grant an evidentiary hearing. And if defense really thought that these investigative efforts hadn't been adequately explained, if there was that ambiguity in the warrant, that was the time to raise it. But isn't the rule that you – that you're arguing for, that you just look at the four corners of the affidavit as to its adequacy? Well, as – true. As to the affidavit itself, you look at the four corners. I would suggest, however, that if there's some ambiguity, if you think that the agent is not being – is somehow being cagey, then the issue there is to explore that at the evidentiary hearing. I guess even if – but the point, I suppose, is that even if the court is not convinced that the affidavit itself specifies that they sufficiently explored that one area, that, again, is not the test. You're not required to exhaust every single possible avenue of investigative technique. In this instance, they basically didn't use any. I mean, they didn't surveil the people. They gave a reason, but they didn't do it. Even, I mean, they – Respectfully, Your Honor. They didn't surveil them by their house, but they didn't give a reason why they didn't try and follow them someplace else. That's actually incorrect, Your Honor. If you look at page 58 of the Excerpt of Record, paragraph 50 of the warrant, it says that on several occasions, law enforcement agents attempted to find and surveil Cecilio Garcia Villalba, either by following Alejandro de Uribe to prearranged meetings or attempting to decipher coded terminology. So they did actually try to surveil Cecilio, but were unsuccessful. You're saying they couldn't find him physically at all? They knew where his house was, but we knew that because of the physical location of the house, they couldn't surveil that. And when they tried to put him and de Uribe together, they couldn't do that because of the difficulties in surveilling de Uribe, who was their known entree into the Garcia Villalba organization. And with respect to the use of informants, which was also raised by the defense, I think it's really worth noting that by the time this application is being made, the only informant we had that was providing any information was inserting Hackett and introducing him to de Uribe. The informant had no contact at all with the Garcia Villalba organization, and no other informants had been developed at that time. That's not to say that we certainly wouldn't have liked to have them, but we just didn't have them. And obviously you can't fault the government for not using informants that they don't have. And I think that that's important to recognize, that there simply were no informants to be utilized. What about trash searches? There's this very vague explanation there. Further attempts to conduct trash searches, complies to compromising, I assume it means, it says comprising, but compromising, the instant investigation on Cecilia Garcia Villalba and the rest of the Garcia organization. Why is that? Why? Oh, the trash searches, well, because it's, reading on, because his residence is situated on the hill in the Sparsely Populated Open Rural Area. Because it is situated on the side of a hill. Further attempts to conduct trash searches could lead to compromising the instant investigation. And read in context, I would suggest it's because the nature of the residence is such that if you try to go search someone's trash in an open rural area, you're likely to be detected. That's what that second sentence modifying the first sentence means. So again, there was thought given to that particular investigative technique. So I think it is simply not a fair characterization of this affidavit to say that it's just pure boilerplate with no attempt to specify the investigative techniques targeted at Cecilia. Cecilia, if the Court has no further questions with regard to the affidavit, I will, since counsel didn't argue the search of the residence, unless the Court has any questions of that, I'll rest on my brief on that point as well. No further questions. Thank you. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Kleinfeld, Berzon